1  ROBBINS ARROYO LLP
   BRIAN J. ROBBINS (190264)
2  brobbins@robbinsarroyo.com
   FELIPE J. ARROYO (163803)
3  farroyo@robbinsarroyo.com
   STEVEN R. WEDEKING (235759)
4  swedeking@robbinsarroyo.com
   600 B Street, Suite 1900
5  San Diego, CA 92101
   Telephone: (619) 525-3990
6  Facsimile: (619) 525-3991

7  Attorneys for Plaintiff

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                         SAN JOSE DIVISION

11 JACQUELINE DOLBY, Derivatively on      )  Case No.
   Behalf of ADVANCED MICRO DEVICES,      )
12 INC.,                                  )
                                          )
13                        Plaintiff,      )  VERIFIED STOCKHOLDER
                                          )  DERIVATIVE COMPLAINT FOR
14            v.                          )  VIOLATION OF SECURITIES LAW,
                                          )  BREACH OF FIDUCIARY DUTY,
15 LISA T. SU, DEVINDER KUMAR, JOHN       )  WASTE OF CORPORATE ASSETS,
   E. CALDWELL, NICHOLAS M.               )  AND UNJUST ENRICHMENT
16 DONOFRIO, AHMED YAHIA, NORA M.         )
   DENZEL, MICHAEL J. INGLIS, JOSEPH      )
17 A. HOUSEHOLDER, JOHN W. MARREN,        )
   ABHI Y. TALWALKAR, MARK                )
18 DURCAN, and BRUCE L. CLAFLIN,          )
                                          )
19                        Defendants,     )
                                          )
20            -and-                       )
                                          )
   ADVANCED MICRO DEVICES, INC., a        )
21 Delaware corporation,                  )
                                          )
22                  Nominal Defendant.    )  DEMAND FOR JURY TRIAL
   _____)

23

24

25

26

27

28

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.   Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.   This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Advanced Micro Devices, Inc. ("AMD" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.   These wrongs resulted in hundreds of millions of dollars in damages to AMD's reputation, goodwill, and standing in the business community.   Moreover, these actions have exposed the Company to millions of dollars in potential liability for violations of state and federal law.

2.     AMD is a multinational semiconductor company that develops computer processors and related technologies for business and consumer markets.   AMD is the second largest supplier and only significant rival to Intel Corporation ("Intel") in the market for the x86-based microprocessors ("x86" or "chips").   The x86 is the world's predominant personal computer control processing unit ("CPU") platform and is used in Windows® and Linux® personal computers ("PCs"), Macs and Chromebooks as well as in embedded systems.

3.     Around 2013, AMD's fiduciaries decided to radically transform the Company which was barely profitable, and reinvent its product portfolio as a means to become more competitive and increase its business prospects.   In so doing, AMD made a strategic decision fraught with risk to challenge Intel for a larger share of the growing and more profitable high-end desktop market by developing and marketing processors focused on performance, rather than just targeting the low end of the market with its cheaper prices.   AMD initiated this turnaround effort in large part with the development of its new Ryzen™ series of CPUs based on AMD's "Zen" x86 CPU core architecture.   Importantly for AMD, the Ryzen CPU would offer performance able

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    to compete with Intel's Core i7 series of CPUs.

2         4.    In the midst of a strategic product shift nearly four years in the making, in 2017,

3    AMD's fiduciaries were informed of a massive security vulnerability in the architecture of many

4    AMD chips which threatened to derail the entire plan.  Employing attack techniques known as

5    "Spectre," researchers identified major flaws in the basic architecture of AMD chips that would

6    allow malicious programs to steal sensitive data, such as passwords, proprietary information, or

7    encrypted communications, by breaking down the built-in isolation between different

8    applications.  Despite being aware of the severity and pervasiveness of the security flaw, AMD

9    failed to alert the millions of affected customers.

10         5.    On January 2, 2018, reports began to surface publicly that most processors on the

11    market contained the security flaw that would make them vulnerable to the Spectre attacks.

12    These reports sparked intense media scrutiny compelling the largest chip manufacturer, Intel, to

13    release a statement on January 3, 2018, publicly admitting that its chips were susceptible to the

14    Spectre attacks.[1]  In its statement, Intel confirmed that the company had been working with

15    AMD and others in an attempt to resolve the issue.  In response to the statement, Intel shed

16    nearly $7.4 billion in market capitalization.

17         6.    On that same day, AMD released statements in which it attempted to distinguish

18    itself from problems plaguing Intel.  In its initial statement, AMD, citing the differences in the

19    architecture of their chips, stated that it "believe[d] there [was] a near zero risk to AMD

20    processors at this time."  Following this statement, AMD's stock price actually rose, as investors

21    believed the Company's chips were more secure than those of its chief rival, Intel.

22         7.    Later that day, however, AMD acknowledged its processors vulnerability to one

23    of the Spectre Variants (Google Project Zero ("GPZ") Variant 1 (Bounds Check Bypass)), but

24    stated that vulnerability to another (GPZ Variant 2 (Branch Target Injection)) had not been

25    demonstrated on AMD processors, claiming again that it posed a "near zero risk of exploitation"

26

27    [1] AMD CPUs do not appear to be affected by a third variant, Google Project Zero ("GPZ")

28    Variant 3 (Rogue Data Cache Load).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

due to differences in AMD architecture. [2]

8.      On January 11, 2018, AMD released another statement admitting the significance of the threat by revealing that GPZ Variant 2 was, in fact, applicable to AMD processors. Following AMD's January 11 admission of the security vulnerability, Company shares fell $0.12, or nearly 1%, to close at $12.02 per share on that day, shedding over $115 million in market capitalization.

9.      For almost a year, AMD's fiduciaries withheld from the public information about the security threats posed to the millions of devices containing the Company's chips.  Despite knowing of the flaws in its chips, between February 2017 and January 11, 2018, AMD publicly and steadily touted the Company's financial performance as well the integrity of its chips, included its recently launched Zen-based products.  Moreover, during the relevant period, defendant Su reaped substantial profits from the sale of her AMD stock while in possession of the damaging, nonpublic material information regarding the security flaw.

10.     Despite AMD's initial attempts to downplay the significance of the security flaws, analysts quickly and accurately concluded that the suggested fixes for the problem would have a negative impact on the performance of the impacted computers and warned that the performance costs would ultimately be borne by the chip makers.  Further, as a direct result of this unlawful course of conduct, the Company is now the subject of at least three consumer class actions lawsuits as well as a federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California on behalf of investors who purchased AMD stock.

## JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

_____

[2] AMD CPUs do not appear to be affected by a third variant, GPZ Variant 3 (Rogue Data Cache Load).

12.     Jurisdiction is also conferred by 28 U.S.C. §1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court also has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) AMD maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to AMD, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**INTRADISTRICT ASSIGNMENT**

15.     A substantial portion of the transactions and wrongdoings that gave rise to the claims in this action occurred in the County of Santa Clara, and as such, this action is properly assigned to the San Jose division of this Court.

**THE PARTIES**

**Plaintiff**

16.     Plaintiff Jacqueline Dolby is a current AMD stockholder and has continuously been a stockholder of AMD since December 2016.  Plaintiff is a citizen of South Carolina.

**Nominal Defendant**

17.     Nominal defendant AMD is a Delaware corporation with principal executive offices located at 2485 Augustine Drive, Santa Clara, California.  Accordingly, AMD is a citizen

of Delaware and California.  AMD is a global semiconductor company primarily offering the x86 as standalone devices or as incorporated into an accelerated processing unit ("APU") chipsets; discrete and integrated graphics processing units ("GPUs"), and professional GPUs; and server and embedded processors and semi-custom System-on-Chip products and technology for game consoles.  The Company also licenses portions of its intellectual property portfolio.  As of December 31, 2017, AMD had approximately 8,900 employees.

**Defendants**

18.    Defendant Lisa T. Su ("Su") is AMD's Chief Executive Officer ("CEO"), President and a director and has been since October 2014.  Defendant Su was also AMD's Senior Vice President from January 2012 to October 2014; Chief Operating Officer from July 2014 to October 2014 and General Manager, Global Business Units from January 2012 to July 2014.  Defendant Su is named in a related securities class action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Su knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the security of AMD's chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to AMD's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading.  While in possession of material, nonpublic information concerning AMD's true business health, defendant Su sold 1,874,457 shares of her stock for $23,036,039.44 in proceeds.  AMD paid defendant Su the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2017 | $924,997 | $6,980,740 | $1,897,770 | $1,076,700 | $14,614 | $10,894,821 |

Defendant Su is a citizen of Texas.

19.    Defendant Devinder Kumar ("Kumar") is AMD's Chief Financial Officer and has been since January 2013; Treasurer and has been since April 2015; and Senior Vice President and has been since 2006.  Defendant Kumar was also AMD's Corporate Controller from 2001 to January 2013; Interim Chief Financial Officer from September 2012 to January 2013; Treasurer

from April 2009 to July 2010; Assistant Treasurer from February 2007 to April 2009; and held various other positions with the Company beginning in 1984.  Defendant Kumar is named in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Kumar knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the security of AMD's chips and processor products.  AMD paid defendant Kumar the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $539,615 | $1,745,181 | $474,441 | $419,040 | $13,615 | $3,191,892 |

Defendant Kumar is a citizen of California.

20.      Defendant John E. Caldwell ("Caldwell") is AMD's Chairman of the Board of Directors (the "Board") and has been since May 2016 and a director and has been since October 2006.  Defendant Caldwell is also a member of AMD's Audit and Finance Committee and has been since at least March 2017.  Defendant Caldwell knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the security of AMD's chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to AMD's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by defendant Su.  AMD paid defendant Caldwell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2017 | $152,500 | $274,623 | $427,123 |

Defendant Caldwell is a citizen of Canada.

21.      Defendant Nicholas M. Donofrio ("Donofrio") was an AMD director from November 2009 to May 2, 2018.  Defendant Donofrio was also Chairman of AMD's Innovation and Technology Committee and a member of that committee from at least March 2016 to May 2, 2018.  Defendant Donofrio knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the security of AMD's chips and processor

products; (ii) failed to maintain adequate disclosure procedures with respect to AMD's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by defendant Su.   AMD paid defendant Donofrio the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $140,000 | $183,087 | $323,087 |

Defendant Donofrio is a citizen of Connecticut.

22.     Defendant Ahmed Yahia ("Yahia") is an AMD director and has been since November 2012.   Defendant Yahia is also a member of AMD's Innovation and Technology Committee and has been since at least March 2016.   Defendant Yahia knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the security of AMD's chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to AMD's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by defendant Su.   AMD paid defendant Yahia the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $95,000 | $183,087 | $278,087 |

Defendant Yahia is a citizen of the United Arab Emirates.

23.     Defendant Nora M. Denzel ("Denzel") is an AMD director and has been since March 2014.   Defendant Denzel knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the security of AMD's chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to AMD's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by defendant Su.   AMD paid defendant Denzel the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $120,000 | $183,087 | $303,087 |

Defendant Denzel is a citizen of Florida.

24.     Defendant Michael J. Inglis ("Inglis") is an AMD director and has been since March 2014.  Defendant Inglis is also a member of AMD's Audit and Finance Committee and Innovation and Technology Committee and has been since at least March 2016.  Defendant Inglis knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the security of AMD's chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to AMD's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by defendant Su.  AMD paid defendant Inglis the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $125,000 | $183,087 | $308,087 |

Defendant Inglis is a citizen of the United Kingdom.

25.     Defendant Joseph A. Householder ("Householder") is an AMD director and has been since September 2014.  Defendant Householder is also Chairman of AMD's Audit and Finance Committee and a member of that committee and has been since at least March 2016.  Defendant Householder knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the security of AMD's chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to AMD's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by defendant Su.  AMD paid defendant Householder the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $130,000 | $183,087 | $313,087 |

Defendant Householder is a citizen of California.

26.     Defendant John W. Marren ("Marren") is an AMD director and has been since February 2017.  Defendant Marren is also a member of AMD's Audit and Finance Committee and has been since February 2017.  Defendant Marren knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the security of AMD's chips and processor products; (ii) failed to maintain adequate disclosure procedures with

1   respect to AMD's operations and risk management; and (iii) failed to prevent or remedy harms

2   caused by illegal insider trading by defendant Su.  AMD paid defendant Marren the following

3   compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $91,583 | $249,307 | $340,890 |

6   Defendant Marren is a citizen of California.

7        27.    Defendant Abhi Y. Talwalkar ("Talwalkar") is an AMD director and has been

8   since July 2017.  Defendant Talwalkar knowingly or recklessly made improper statements in the

9   Company's press releases and public filings concerning: (i) the security of AMD's chips and

10  processor products; (ii) failed to maintain adequate disclosure procedures with respect to AMD's

11  operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal

12  insider trading by defendant Su.  AMD paid defendant Talwalkar the following compensation as

13  a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $52,500 | $190,956 | $243,456 |

16  Defendant Talwalkar is a citizen of California.

17       28.    Defendant Mark Durcan ("Durcan") is an AMD director and has been since

18  November 2017.  Defendant Durcan is also a member of AMD's Innovation and Technology

19  Committee and has been since at least March 2018.  Defendant Durcan knowingly or recklessly

20  made improper statements in the Company's press releases and public filings concerning: (i) the

21  security of AMD's chips and processor products; (ii) failed to maintain adequate disclosure

22  procedures with respect to AMD's operations and risk management; and (iii) failed to prevent or

23  remedy harms caused by illegal insider trading by defendant Su.  AMD paid defendant Durcan

24  the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $17,976 | $151,850 | $169,826 |

27  Defendant Durcan is a citizen of Idaho.

28

29.     Defendant Bruce L. Claflin ("Claflin") was an AMD director from August 2003 to April 2017 and Chairman of the Board from March 2009 to May 2016.  Defendant Claflin knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the security of AMD's chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to AMD's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by defendant Su.  Defendant Claflin is a citizen of Florida.

30.     The defendants identified in ¶¶18-19 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶18, 20-29 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶20, 24-26 are referred to herein as the "Audit and Finance Committee Defendants."  The defendants identified in ¶¶21, 24, 28 are referred to herein as the "Innovation and Technology Committee Defendants."  Collectively, the defendants identified in ¶¶18-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe AMD and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AMD in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of AMD and not in furtherance of their personal interest or benefit.

32.     To discharge their duties, the officers and directors of AMD were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of AMD were required to, among other things:

(a)     when put on notice of problems with the Company's business practices and observations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(b)      conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)      remain informed as to how AMD conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

33.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of AMD, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

34.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its business prospects, including with respect to the security risks associated with AMD's core products.  Defendants further failed to implement proper internal controls to ensure the Company provided its customers with material information about the security flaws inherent in its chips, and to ensure that this material information was also adequately and timely disclosed to the SEC and the investing public.  These improper practices wasted the Company's assets, and caused AMD to incur substantial damage.

35.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of AMD, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, AMD has expended, and will continue to expend, significant sums of money.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Additional Duties of the Audit and Finance Committee Defendants**

36.     In addition to these duties, under its Charter, the Audit and Finance Committee Defendants, defendants Caldwell, Householder, Inglis and Marren, owed specific duties to AMD to assist the Board in overseeing accounting and financial reporting processes of the Company and the audits of the Company's financial statements.

**Additional Duties of the Innovation and Technology Committee Defendants**

37.     In addition, the Innovation and Technology Committee Defendants, defendants Donofrio, Durcan, Inglis and Yahia, assumed enhanced duties and responsibilities through their membership on the Innovation and Technology Committee.  Adopted on April 26, 2017, the Innovation and Technology Committee members are required to:

> Review, evaluate and make recommendations to the Board regarding the Company's major technology plans, strategies and intellectual property, including its research and development activities, the technical and market risks associated with product development and investment, and the protection of the company's intellectual property;

> * * *

> Monitor the performance of the Company's technology development in support of its overall business strategy;

> Monitor and evaluate existing and future trends in technology that may affect the Company's strategic plans, including monitoring of overall industry trends;

> Assess the Company's risk mitigation policies and procedures relating to products based on new technology or significant innovations to existing technology….

**Additional Duties Pursuant to the Company's Worldwide Standards of Business Conduct**

38.     AMD has adopted Worldwide Standards of Business Conduct ("WWSBC") purportedly supports the Company's commitment to high ethical standards and compliance with laws, regulations, and Company policies.  In addition to applying to Company employees, these standards also apply to AMD's Board.  Amongst other things, the standards make AMD employees and Board members responsible for:

> • Obeying all applicable laws and regulations governing our business conduct.

- Being honest, fair and trustworthy in your AMD activities and relationships.

\* \* \*

- Maintaining confidentiality and not misusing Company "insider" information.

39.   AMD's WWSBC also seeks to promote accuracy in the Company's selling and marketing practices and product representations, and requires that:

Employees who sell and market Company products and services or communicate with customers or the public with respect to AMD products should be sure to accurately describe the attributes, features and merits of those products and services.  Employees should not make claims about Company products or services that are inaccurate or unverified, or that cannot be substantiated; nor should they make claims about a competitor's or third party's products or services that are not based on current published materials or other factual data approved by an authorized Company representative for such purposes.

40.   The WWSBC further provides restrictions on securities trading by any "employee in possession of material non-public information regarding AMD and any other publicly traded company obtained in the course of employment at AMD…."

**Additional Duties Pursuant to the Company's Code of Ethics**

41.   AMD maintains a Code of Ethics for Executive Officers And All Senior Finance Executives (the "Code"), which requires the Company's executive officers to adhere to the "highest ethical standards and compliance with the laws, regulations and Company policies applicable to corporate financial transactions, reporting and disclosure."  According to the Code, the Company requires all officers to abide by the Company's Business and Accounting and Financial Reporting Principles, which requires executives to maintain, among other things, reporting systems and procedures to ensure:

The Company's books and records contain no false or misleading entries.

\* \* \*

The Company adheres to financial reporting requirements set forth in the laws and regulations that govern the Company's business.  In this regard, Executives will ensure that accurate financial statements and disclosures of the Company's operations, financial conditions and cash flows are prepared, and that periodic financial reports are filed in a timely manner and in a manner that facilitates the highest degree of clarity of content and meaning.

- 13 -

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

42.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

43.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of AMD, regarding the Individual Defendants' management of AMD's operations and the prospects of the Company's newly-launched chips and processors; (ii) facilitate defendant Su's illicit sale of $23,036,039.44 of her personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at AMD and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

44.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

45.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

46.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the

- 14 -

Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**FACTUAL BACKGROUND**

48.     AMD is a multinational semiconductor company that develops computer processors and related technologies for business and consumer markets.  AMD is the second largest semiconductor company and only significant rival to Intel in the market for the x86-based microprocessors.  The x86 is the world's predominant personal computer CPU platform and is used in Windows and Linux PCs, Macs and Chromebooks as well as in embedded systems.

49.     Despite Intel's dominant position of the as the market leader for microprocessors, the market for AMD products remains very competitive.  Within this competitive landscape, one of the few remaining avenues for growth and profitability is the high-end computer processor market.  To compete in this arena, AMD, has increasingly sought to achieve increased performance by creating faster chips.

50.     Because AMD is smaller and barely profitable, the incremental impact of market share gains is much more profound on AMD as compared to Intel.  Historically, Intel has dominated the high-end computing market and AMD has remained competitive only in the lower end of the market.

51.     Beginning in approximately 2013, AMD made a strategic decision to challenge Intel for a larger share of the high-end of the desktop market by developing and marketing processors focused more on performance, rather than just targeting the low end of the market with its cheaper prices.  Consistent with that plan, AMD initiated a turnaround effort with the development of its Zen architecture and the introduction of its Ryzen CPU.  Importantly for

AMD, the Ryzen chips would offer performance able to compete with Intel's Core i7 series of CPUs.

52.    AMD's move to compete in the high-end market was seen by analysts as both a necessary and risky proposition because it links the fate of the Company to the performance of Ryzen.  In a May 15, 2017 *Market Realist* article titled "Understanding the Financial Impact of Ryzen on AMD's Earnings," the author stated "If Ryzen delivers a strong performance, AMD could return to its growth path.  If Ryzen fails to show a consistent performance and instead delivers a lower-than-expected one, AMD could come crashing down."

53.    On January 31, 2017, AMD issued a press release announcing revenue for the fourth quarter of 2016 of $1.11 billion, a 15% increase year-over-year, and an operating loss of $3 million, compared to an operating loss of $49 million for the fourth quarter of the previous year and an operating loss of $293 million in the prior quarter and net loss of $51 million, or $0.06 per share.

54.    For the full year 2016, the Company reported revenue of $4.27 billion, up 7% from the previous year and an operating loss of $372 million compared to an operating loss of $481 million in the prior year.  AMD also reported a net loss of $497 million compared to a net loss of $660 million in the prior year, or $0.60 per share.

55.    The press release touted the Company's overall financial improvement, but also promoted the upcoming release of its new Zen-based products and the potential impact of those products to the Company's bottom line.  The press release stated:

> We met our strategic objectives in 2016, successfully executing our product roadmaps, regaining share in key markets, strengthening our financial foundation, and delivering annual revenue growth," said Dr. Lisa Su, AMD president and CEO. "As we enter 2017, we are well positioned and on-track to deliver our strongest set of high-performance computing and graphics products in more than a decade.

56.    On January 31, 2017, AMD held an earnings conference call with analysts and investors to discuss the Company's fourth quarter and full year results.  During the call, defendant Su reinforced the bet the Company made on its future and the importance of the new Ryzen products to the overall health of the Company, stating:

> All of our work in the past 2 years has been designed to strengthen the technical, operational and financial foundation of the company. We entered 2017 with strong revenue growth and margin expansion opportunities as we prepare to launch our Zen-based CPUs and Vega GPUs that can return AMD to the high-performance markets where we have not materially participated in recent years. The production ramp, customer adoption and ecosystem support for our Zen-based desktop processor, Ryzen, are all mapped into our plans.

> * * *

> [B]ased on our current market expectations and the strength of our upcoming products, we are confident we can grow annual revenue, expand gross margin and deliver non-GAAP net income in 2017.

57.     On or about March 2, 2017, AMD began the release of its Ryzen series of chips with the release of Ryzen 7.  According to analysts, Ryzen CPUs represented a real threat to Intel's monopoly on high-performance computing by providing chips with performance comparable to Intel chips at a significantly better price.  In addition, AMD was set to launch Ryzen 3 in the third quarter of 2017 and the notebook variants of Ryzen 7, 5, and 3 in the late third or early fourth quarter of 2017.

58.     On April 26, 2017, AMD hosted its 2017 annual stockholder meeting and analyst call.  During the call, defendant Su continued to signal AMD's new focus as a maker of high-end products and importance of these products for the future of the Company, stating:

> Our company is really about high-performance technologies and building the greatest products for high-performance computing. And our goals are often very ambitious, but we attack them with strong determination, because we do believe that high-performance computing is absolutely necessary as we look at what's happening in the industry over the next 5 to 10 years.

> * * *

> So 2017 for us is about delivering our high-performance computing products. This is the strongest lineup we have had in over a decade, and it comes from much of the engineering efforts that we've invested in over the last 4 to 5 years, and they include Ryzen, Radeon Vega, Naples as well as Radeon Instinct, all in their own very, very interesting and important products for us.

> Now let me go through a little bit about each of these products.  So Ryzen, Ryzen, is our first product using the Zen core.  The Zen core was a brand new from scratch design that we have worked on over the last 4 years, and with Ryzen in desktop, we have the world's fastest 8 core desktop processor.  We launched

- 17 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Ryzen 7 on March 2, and we launched Ryzen 5 on April 11, and the overall reception from the market has been very strong.

The performance has exceeded our expectations and we have price-performance leadership in the market, and so we're very pleased where Ryzen stands today.

59.    On May 1, 2017, AMD issued a press release announcing the Company's financial results for its first fiscal quarter of 2017, highlighting revenue increase of 18% year-over-year for the first quarter of 2017.  In the press release, defendant Su touted the continued improved financial condition of the Company as well as the importance of its new high-performance products on continued growth, stating:

> "We achieved 18 percent year-over-year revenue growth driven by strong demand for our high performance Ryzen CPUs as well as graphics processors...."  "We are positioned for solid revenue growth and margin expansion opportunities across the business in the year ahead as we bring innovation, performance, and choice to an expanding set of markets."

60.    On May 1, 2017, AMD held an earnings conference call with analysts and investors to discuss the Company's first quarter results.  While discussing the Company's results, defendant Su lauded the impact of Ryzen CPUs on AMD's bottom line:

> First quarter revenue increased 18% from a year ago to $984 million based on growth across both of our business segments.  Gross margin also improved, driven largely by the success of our recently launched Ryzen CPUs.  I am pleased with our first quarter product execution and improved year-over-year financial results, which demonstrate the revenue growth and gross margin expansion potential with our strong set of new products.
>
> Looking at our Computing and Graphics segment. We delivered our fourth straight quarter of double digit percentage year-on-year revenue growth. Strong demand for Ryzen CPUs and improved GPU sales resulted in CG revenue increasing 29% from the year-ago period. CG revenue declined 1% sequentially, which was better-than-normal seasonality as significant growth in desktop processor sales, driven by the first month of Ryzen CPU sales, largely offset seasonal declines in GPU and notebook APU sales.
>
> Solid demand for our family of premium Ryzen 7 processors, including our flagship Ryzen 7 1800X offering, which is the industry's highest performance 8-core CPU, drove our highest desktop processor revenue in more than 2 years. Ryzen CPUs have been consistently ranked among the top-selling processors at global e-tailers and retailers. And press reviews and end-user sentiment have highlighted the strong performance and value proposition.

- 18 -

In early April, we launched our enthusiast-class Ryzen 5 processors and received overwhelmingly positive reviews that demonstrate our multi-threaded leadership and unmatched value proposition.

The Ryzen CPU partner ecosystem also continues to strengthen.  We have seated more than 300 software developers to support their work optimizing for Ryzen CPUs and have already seen double digit performance gains across a number of top-tier gaming titles. Last week, the first Ryzen-based OEM gaming desktops were announced, and we continue the rapid rollout of Ryzen-powered systems with additional launches planned for major OEMs later this quarter.

**THE INDIVIDUAL DEFENDANTS CAUSED OR ALLOWED AMD
TO REPEATEDLY MAKE IMPROPER STATEMENTS
<u>CONCERNING THE SECURITY OF AMD CHIPS</u>**

61.     In the midst of the Company's risk-laden strategic product shift, nearly four years in the making, the Board and executive management at AMD were made aware of certain security vulnerabilities in the architecture of certain of its chips which threatened to derail its entire plan.  Employing attack techniques known as "Spectre," the GPZ researchers identified and were able to exploit major flaws in the basic architecture of AMD chips that would allow malicious programs to steal sensitive data, such as passwords, proprietary information, or encrypted communications from the memory of other programs running on a computer.

62.     The Spectre attacks take advantage of a design feature called "speculative execution" built into the architecture of x86-based chips.  While speculative execution delivered a dramatic performance improvement over previous processors, it also introduced a potential security vulnerability which exposed potentially billions of computers and other electronic devices to the Spectre attacks.  This security flaw allows malicious programmers to gain access to a machine's protected memory, allowing it to read sensitive private personal data such as passwords and encryption keys.

63.     As described in a paper published by researchers who discovered the Spectre attacks simultaneous to the GPZ researchers:

Modern processors use branch prediction and speculative execution to maximize performance. For example, if the destination of a branch depends on a memory value that is in the process of being read, CPUs will try to guess the destination and attempt to execute ahead.  When the memory value finally arrives, the CPU either discards or commits the speculative computation.  Speculative logic is unfaithful in how it executes, can access to the victim's memory and registers, and

can perform operations with measurable side effects. Spectre attacks involve inducing a victim to speculatively perform operations that would not occur during correct program execution and which leak the victim's confidential information via a side channel to the adversary.[3]

64.    These flaws identified through the Spectre attacks are architectural in nature and therefore impact potentially billions of devices containing AMD chips. The vulnerabilities created by this design flaw stretches to include machines operating Windows, OS X, and Android software platforms as well as cloud platforms. Because Spectre attacks exploit a security vulnerability that arose as a side effect of efforts to increase speed and performance, the fixes employed by AMD to address the vulnerability slow down certain types of operations. The financial impact associated with degradation in performance is one that will likely be borne by AMD. Such costs would be in addition to any potential recall related costs, loss of market share to competitors, delay in future product releases associated with fixing the problem, or reputational damage to AMD's fledgling foray into the high-end market. Moreover, the U.S. Department of Homeland Security's computer emergency readiness team, US-CERT, has suggested there may be no practical solution to the problem beyond the nearly unfeasible option of replacing affected CPUs.

65.    Notably, although the Spectre flaw was reported to AMD in June 2017, at the latest, researchers have been writing about architecturally-based security flaws in chips since 2005, and by 2016, researchers were specifically focused on flaws resulting from speculative execution.

66.    As detailed below, since at least February 2017, the Individual Defendants repeatedly failed to make the public aware of the security threats posed by the Spectre attacks during the relevant period. Instead, AMD repeatedly touted the Company's new product releases and how this would ultimately impact its business prospects. In truth, sensitive user data in most

---

[3] Paul Kocher, *et al.*, *Spectre Attacks: Exploiting Speculative Execution*, https://spectreattack .com/spectre.pdf.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

devices currently utilizing AMD chips is vulnerable to the Spectre methods of attack and the Company was keenly aware of this fact.

67.     On February 21, 2017, AMD filed its Annual Report on Form 10-K with the SEC for the fourth fiscal quarter and year ended December 31, 2016 (the "2016 Form 10-K").  For the quarter, AMD had revenues of $1.11 billion, up 15% from the fourth quarter of 2015.  AMD also reported gross margin for the quarter was $351 million, up from $283 million for the quarter the previous year.  As a percentage, AMD's gross margin was 32%, compared to 30% in the fourth quarter of 2015.  AMD had an operating loss of $3 million for the quarter, compared to a loss of $49 million a year ago, and a net loss of $51 million this quarter compared to $102 million in the fourth quarter of 2015.  This resulted in a loss per share of $0.06, compared to a loss of $0.13 in the previous year.

68.     For the full fiscal year, AMD had revenues of $4.27 billion, an increase of 7%, and a gross margin of 23%, a drop of 4% compared to 2015. The Company also reported an operating loss of $372 million for the year, compared to $481 million in 2015, and net loss was $497 million, compared to $660 million the previous year.  For the full year, AMD had a net per share loss of $0.60, which was an improvement from the $0.84 loss in 2015.

69.     The 2016 Form 10-K also contained information acknowledging the risks posed to AMD from security vulnerabilities, stating:

> [D]ata breaches and cyber-attacks could compromise our intellectual property or other sensitive information, be costly to remediate and cause significant damage to our business and reputation.
>
> In the ordinary course of our business, we maintain sensitive data on our networks, including our intellectual property and proprietary or confidential business information relating to our business and that of our customers and business partners.  The secure maintenance of this information is critical to our business and reputation.  We believe that companies have been increasingly subject to a wide variety of security incidents, cyber-attacks, hacking and phishing attacks, and other attempts to gain unauthorized access.  These threats can come from a variety of sources, all ranging in sophistication from an individual hacker to a state-sponsored attack.  Cyber threats may be generic, or they may be custom-crafted against our information systems.  Over the past year, cyber-attacks have become more prevalent and much harder to detect and defend against.  Our network and storage applications may be subject to unauthorized

access by hackers or breached due to operator error, malfeasance or other system disruptions. It is often difficult to anticipate or immediately detect such incidents and the damage caused by such incidents.   These data breaches and any unauthorized access or disclosure of our information or intellectual property could compromise our intellectual property and expose sensitive business information. Cyber-attacks could also cause us to incur significant remediation costs, result in product development delays, disrupt key business operations and divert attention of management and key information technology resources.   These incidents could also subject us to liability, expose us to significant expense and cause significant harm to our reputation and business.   ***In addition, we could be subject to potential claims for damages resulting from loss of data from alleged vulnerabilities in the security of our processors.***   We also maintain confidential and personally identifiable information about our workers.

70.    The 2016 Form 10-K contained certifications pursuant to section 13(a) or section 15(d) of the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Su and Kumar.   Further, the 2016 Form 10-K was signed by defendants Caldwell, Claflin, Denzel, Donofrio, Householder, Inglis, Marren, and Yahia.

71.    On May 8, 2017, AMD filed with the SEC its Quarterly Report on Form 10-Q for the first fiscal quarter ended April 1, 2017 (the "Q1 2017 Form 10-Q").   For the quarter, the Company reported revenue of 2017 of $984 million, operating loss of $29 million and net loss of $73 million, or $0.08 per share.   The Q1 2017 Form 10-Q omitted or failed to disclose that there were security issues with AMD chips.

72.    The Q1 2017 Form 10-Q also contained information acknowledging the risks posed to AMD from security vulnerabilities, stating:

In the ordinary course of our business, we maintain sensitive data on our networks, including our intellectual property and proprietary or confidential business information relating to our business and that of our customers and business partners. The secure maintenance of this information is critical to our business and reputation. We believe that companies have been increasingly subject to a wide variety of security incidents, cyber-attacks, hacking and phishing attacks, and other attempts to gain unauthorized access. These threats can come from a variety of sources, all ranging in sophistication from an individual hacker to a state-sponsored attack. Cyber threats may be generic, or they may be custom-crafted against our information systems. Over the past year, cyber-attacks have become more prevalent and much harder to detect and defend against. Our network and storage applications may be subject to unauthorized access by hackers or breached due to operator error, malfeasance or other system disruptions.  It is often difficult to anticipate or immediately detect such incidents and the damage caused by such incidents. These data breaches and any

unauthorized access or disclosure of our information or intellectual property could compromise our intellectual property and expose sensitive business information. Cyber-attacks could also cause us to incur significant remediation costs, result in product development delays, disrupt key business operations and divert attention of management and key information technology resources. These incidents could also subject us to liability, expose us to significant expense and cause significant harm to our reputation and business. ***In addition, we could be subject to potential claims for damages resulting from loss of data from alleged vulnerabilities in the security of our processors.*** We also maintain confidential and personally identifiable information about our workers. The integrity and protection of our worker data is critical to our business and our workers have a high expectation that we will adequately protect their personal information. We anticipate an increase in costs related to:

- implementing new data security procedures, including costs related to upgrading computer and network security;

- training workers to maintain and monitor our security measures;

- remediating any data security breach and addressing the related litigation; and

- mitigating reputational harm.

73. The Q1 2017 Form 10-Q contained certifications pursuant to sections 302 and 906 of SOX by defendants Su and Kumar.

74. On July 25, 2017, the Company issued a press release announcing a 19% revenue increase over the previous year for its second fiscal quarter ended July 1, 2017. The press release not only touted the Company's revenue gains and margin growth, but also promoted the prospects of new products that the Individual Defendants knew, or were recklessly unaware, and were vulnerable to attacks like those posed by Spectre. The press release stated:

Our second quarter results demonstrate strong growth driven by leadership products and focused execution," said Dr. Lisa Su, AMD president and CEO. "Our Ryzen desktop processors, Vega GPUs, and EPYC datacenter products have received tremendous industry recognition. We are very pleased with our improved financial performance, including double digit revenue growth and year-over-year gross margin expansion on the strength of our new products.

75. On July 25, 2017, AMD hosted an earnings conference call with analysts and investors to discuss its quarterly earnings. During the call, defendants Kumar and Su continued to praise AMD's growth and continued transformation into high-end products. According to defendant Su:

- 23 -

Q2 was a strong quarter for us as we continued to ramp our high-performance product portfolio. Second quarter revenue increased 19% to $1.22 billion, and gross margin improved year-over-year. Importantly, we returned to non-GAAP net income profitability in the quarter, driven by strong growth in our Computing and Graphics segment.

Looking at our Computing and Graphics segment, we made excellent progress in the quarter and reported operating profitability for the first time in 3 years based on our leadership Ryzen processor and GPU product offerings.  The expansion and growing adoption of our Ryzen CPUs, combined with our sixth consecutive quarter of double-digit year-over-year graphics revenue growth, resulted in a 51% increase in Computing and Graphics segment sales year-over-year.

Client computing revenue increased by strong double-digit percentage from a year ago, driven by a significant ramp and strong sell-through of our Ryzen CPUs in the first full quarter of sales.  Our Ryzen family of processors drove a richer mix of shipments, and client ASPs improved significantly from a year ago. All major PC OEMs have announced premium Ryzen-based desktop systems with widespread availability expected for the back-to-school and holiday seasons.

As we move into the second half of 2017, we are on track to complete the full family of Ryzen processors, including Ryzen 3 processors targeting the mainstream and value market segments with on-shelf availability later this week; Ryzen ThreadRipper products for the high-end desktop markets with global component channel availability in early August; Ryzen PRO-based offerings targeting the commercial client segment with availability in Q3; and Ryzen Mobile APUs, which will be available for the consumer market later this year.

76.     On July 30, 2017, the Company issued a press release titled, "Ultimate Boost for High-End Desktop Market With Aug. 10 Availability of 16- and 12-Core Ryzen™ Threadripper™ Processors."  According to the press release, the Company's latest offering was a:

"Zen"-based CPU with up to 60 percent more cores than any previous HEDT processor, including leadership I/O bandwidth.  Designed to bring innovation and competition back to the full spectrum of PC markets, the high performance Ryzen CPU architecture delivers uncompromising performance in Ryzen Threadripper, delivering advanced feature sets, increased efficiency, and leadership performance on today's most demanding PC workloads.

The press release omitted or failed to disclose that there were security issues with AMD's chips.

77.     On August 3, 2017, AMD filed with the SEC its Quarterly Report on Form 10-Q for the second fiscal quarter ended July 1, 2017 (the "Q2 2017 Form 10-Q").  For the quarter, the Company reported revenue of $1.22 billion, up 19% year-over-year and 24% sequentially.  AMD also reported gross margin of 33%, up two percentage points year-over-year driven by the first

full quarter of Ryzen processor sales.  Operating income was $25 million compared to an operating loss of $8 million the prior year and an operating loss of $29 million in the prior quarter.  The Q2 2017 Form 10-Q omitted or failed to disclose that there were security issues with AMD chips.

78.   The Q2 2017 Form 10-Q also contained information acknowledging the risks posed to AMD from security vulnerabilities, stating:

> Data breaches and cyber-attacks could compromise our intellectual property or other sensitive information, be costly to remediate and cause significant damage to our business and reputation.
>
> In the ordinary course of our business, we maintain sensitive data on our networks, including our intellectual property and proprietary or confidential business information relating to our business and that of our customers and business partners.  The secure maintenance of this information is critical to our business and reputation. We believe that companies have been increasingly subject to a wide variety of security incidents, cyber-attacks, hacking and phishing attacks, and other attempts to gain unauthorized access.  These threats can come from a variety of sources, all ranging in sophistication from an individual hacker to a state-sponsored attack.  Cyber threats may be generic, or they may be custom-crafted against our information systems.  Cyber-attacks have become increasingly more prevalent and much harder to detect and defend against.  Our network and storage applications, as well as those of our customers, business partners, and third party providers, may be subject to unauthorized access by hackers or breached due to operator error, malfeasance or other system disruptions.  It is often difficult to anticipate or immediately detect such incidents and the damage caused by such incidents. These data breaches and any unauthorized access, misuse or disclosure of our information or intellectual property could compromise our intellectual property and expose sensitive business information.  Cyber-attacks on us or our customers, business partners or third party providers could also cause us to incur significant remediation costs, result in product development delays, disrupt key business operations and divert attention of management and key information technology resources. These incidents could also subject us to liability, expose us to significant expense and cause significant harm to our reputation and business. ***In addition, we could be subject to potential claims for damages resulting from loss of data from alleged vulnerabilities in the security of our processors.*** We also maintain confidential and personally identifiable information about our workers. The integrity and protection of our worker data is critical to our business and our workers have a high expectation that we will adequately protect their personal information.

79.   The Q2 2017 Form 10-Q contained certifications pursuant to sections 302 and 906 of SOX by defendants Su and Kumar.

80.     On August 10, 2017, the Company issued a press release titled, "AMD Launches the Highest-Performance Desktop Processor, Ever, with Ryzen™ Threadripper™ High End Desktop Processors."  The press release touted the Company's technical achievements allowing it to compete in the high-end computing market.  According to the press release, AMD was now making available:

> [T]wo models of its highly anticipated, Ryzen™ Threadripper™ high-end desktop processors, AMD Ryzen™ Threadripper™ 1950X and AMD Ryzen™ Threadripper™ 1920X.  ***During an already record-setting year for the company through the successful launch of several award-winning Ryzen™ desktop processors for the AM4 platform, today's release of Ryzen Threadripper marks a major step forward in performance and features for the high-end desktop market, with the new processor exceeding the expectations of even the most demanding developers, researchers, prosumers, creators, and multi-tasking gamers***.  Built around the new AMD x86 "Zen" core architecture, Ryzen Threadripper delivers overwhelming power, unrestrained potential, and indisputable supremacy over comparable products in the market.

> "The level of global support and excitement built-up around AMD Ryzen processors has been incredible to watch these last few months, and with today's Ryzen Threadripper launch, we deliver a new level of computing power to the world's fastest ultra-premium desktop systems via an entirely new platform and set of multi-core processors," said Jim Anderson, senior vice president and general manager, Computing and Graphics Group, AMD.  "Ryzen Threadripper is the jolt of innovation that the high-end desktop customer was waiting for, providing the long-awaited ability to choose a processor that best fulfills their computing needs at a competitive price."

81.     On October 24, 2017, the Company issued a press release announcing a revenue increase of 26% year-over-year for its third fiscal quarter ended September 30, 2017.  The press release touted the continued improved financial condition of the Company as well as the importance of its new high-performance products on continued growth.  According to the press release:

> "Strong customer adoption of our new high-performance products drove significant revenue growth and improved financial results from a year ago," said Dr. Lisa Su, AMD president and CEO.  "Our third quarter new product introductions and financial execution mark another important milestone as we establish AMD as a premier growth company in the technology industry."

82.     On October 24, 2017, AMD held an earnings conference call with analysts and investors to discuss its quarterly earnings.  During the conference call, defendants Kumar and Su boasted about AMD's recent financial performance and new product offerings.  While discussing AMD's results, neither defendant Su, nor defendant Kumar, ever mentioned the threats posed to the Company's prospects by Spectre.

83.     On October 26, 2017, the Company issued a press release titled, "AMD Introduces New Ryzen Mobile Processors, the World's Fastest Processor for Ultrathin Notebooks."  The press release touted the Company's technical achievements allowing it to compete in the high-end computing market.  According to the release:

> "We promised to bring innovation and competition back to every segment of the PC market in 2017, and today marks the fulfillment of that promise for consumer notebooks following our successful roll-out across the consumer, commercial and high-end desktop markets earlier this year," said Jim Anderson, senior vice president and general manager, Computing and Graphics Group, AMD. "Ryzen™ mobile processors offer leadership performance for everyday activities, multi-tasking, and advanced workloads alike, all while enabling amazing battery life. We are pleased to deliver the world's fastest processor for ultrathin notebooks, offering consumers the opportunity to get the most out of their digital lives through our OEM partners' notebook designs."

84.     On November 2, 2017, the Company filed with the SEC its Quarterly Report on Form 10-Q for the third fiscal quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q"). For the quarter, the Company reported revenue of $1.64 billion, operating income of $126 million and net income of $71 million, and diluted earnings per share of $0.07.  The Q3 2017 Form 10-Q omitted or failed to disclose that there were security issues with AMD's chips.

85.     The Q3 2017 Form 10-Q also contained information acknowledging the risks posed to AMD from security vulnerabilities, stating:

> Data breaches and cyber-attacks could compromise our intellectual property or other sensitive information, be costly to remediate and cause significant damage to our business and reputation.
>
> In the ordinary course of our business, we maintain sensitive data on our networks, and also may maintain sensitive information on our business partners' and third party providers' networks, including our intellectual property and proprietary or confidential business information relating to our business and that

of our customers and business partners. The secure maintenance of this information is critical to our business and reputation. We believe that companies have been increasingly subject to a wide variety of security incidents, cyber-attacks, hacking and phishing attacks, and other attempts to gain unauthorized access. These threats can come from a variety of sources, all ranging in sophistication from an individual hacker to a state-sponsored attack. Cyber threats may be generic, or they may be custom-crafted against our information systems. Cyber-attacks have become increasingly more prevalent and much harder to detect and defend against.  Our network and storage applications, as well as those of our customers, business partners, and third party providers, may be subject to unauthorized access by hackers or breached due to operator error, malfeasance or other system disruptions.  It is often difficult to anticipate or immediately detect such incidents and the damage caused by such incidents. These data breaches and any unauthorized access, misuse or disclosure of our information or intellectual property could compromise our intellectual property and expose sensitive business information.  Cyber-attacks on us or our customers, business partners or third party providers could also cause us to incur significant remediation costs, result in product development delays, disrupt key business operations and divert attention of management and key information technology resources. These incidents could also subject us to liability, expose us to significant expense and cause significant harm to our reputation and business.  ***In addition, we could be subject to potential claims for damages resulting from loss of data from alleged vulnerabilities in the security of our processors.***  We also maintain confidential and personally identifiable information about our workers. The integrity and protection of our worker data is critical to our business and our workers have a high expectation that we will adequately protect their personal information.

86.     The Q3 2017 Form 10-Q contained certifications pursuant to SOX by defendants Su and Kumar.

**THE DIRECTOR DEFENDANTS VIOLATED SECTION 14(a)**
**OF THE EXCHANGE ACT AND SEC RULE 14a-9, AND BREACHED**
**THEIR FIDUCIARY DUTIES, BY CAUSING THE COMPANY TO FILE A**
**MATERIALLY MISLEADING PROXY STATEMENT**

87.     The Director Defendants also violated section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing AMD to issue a Proxy Statement that failed to disclose serious security flaws inherent in AMD chips and the deficient internal and disclosure controls that allowed those security flaws and the potential impact of those security flaws to the Company's business prospects to be withheld from its customers and investors.

88.     On March 8, 2017, defendants Caldwell, Denzel, Donofrio, Householder, Inglis, Marren, Su, and Yahia caused AMD to file with the SEC its Proxy Statement on Form DEF 14A in connection with the 2017 Annual Meeting of Stockholders held on April 26, 2017 (the "2017

Proxy").  In the 2017 Proxy, these defendants solicited stockholder votes to, among other things, reelect themselves to the Board.

89.     With respect to the Board reelections, the 2017 Proxy represented:

## CORPORATE GOVERNANCE

The Board has adopted the Principles of Corporate Governance ("Governance Principles") to address significant corporate governance issues. The Governance Principles provide a framework for our corporate governance matters and include topics such as Board and Board committee composition and evaluation. The Nominating and Corporate Governance Committee is responsible for reviewing the Governance Principles and recommending any changes to the Governance Principles to the Board.

\* \* \*

**Risk Oversight**

The Board's role in risk oversight is consistent with our leadership structure, with our Chief Executive Officer and other members of management having responsibility for day-to-day risk management activities and processes, and our Board and its committees being actively involved in overseeing our risk management. The Board and management consider "risk" for these purposes to be the possibility of an undesired occurrence that could threaten the viability of the company, result in a material destruction of our assets or shareholder value, or materially impact our long term performance. Examples of the types of risks faced by us include:

• business-specific risks related to our ability to develop new products and services, our strategic position in key existing and new markets, our operational execution and infrastructure, our relationships with our third party manufacturing suppliers and competition in the microprocessor and graphics markets;

• macroeconomic risks, such as adverse global economic conditions and global geo-political events; and

• "event" risks, such as natural disasters and cybersecurity threats.

We engage in activities that seek to take calculated risks that protect the value of our existing assets and create new or future value.  Management is responsible for day-to-day risk management activities and processes. Members of senior management participate in identifying and assessing risks and risk controls, developing recommendations to determine the appropriate manner in which to control risk and implementing risk mitigation activities. Our Chief Executive Officer has ultimate responsibility for management of our business, including enterprise level risks and the risk management program and processes.

In fulfilling its oversight role, the Board focuses on understanding the nature of our enterprise risks, including risks in our operations, finance and strategy, organization, compliance and external exposures as well as the adequacy of our risk assessment and risk management processes. ***The Board has implemented a risk oversight model and periodically receives reports and updates from management. At least annually, the Board discusses with management the appropriate level of risk relative to our strategy and objectives and reviews with management our existing risk management processes and their effectiveness. The Board also receives periodic management updates on our operations, organization, financial position and results and strategy and, as appropriate, discusses and provides feedback with respect to risks related to these topics.*** In addition, the Board receives full reports from the following Board committee chairs regarding each committee's considerations and actions related to the specific risk topics over which the committee has oversight:

• The Audit and Finance Committee assists the Board in overseeing our enterprise risk management process; reviews our portfolio of risk; discusses with management significant financial, reporting, regulatory and legal compliance risks in conjunction with enterprise risk exposures as well as risks associated with our capital structure; and reviews our policies with respect to risk assessment and risk management and the actions management has taken to limit, monitor or control financial and enterprise risk exposure. The Audit and Finance Committee meets with members of our Internal Audit department to discuss any issues that warrant attention.

• The Compensation Committee oversees risk management as it relates to our compensation policies and practices. It reviews with management whether our compensation programs may create incentives for our employees to take excessive or inappropriate risks which could be reasonably likely to have a material adverse effect on us. For additional details, see "Compensation Policies and Practices," below. Additionally, the Compensation Committee oversees organizational risks, including leadership succession, talent capacity, capabilities, attraction, retention and culture.

• The Nominating and Corporate Governance Committee considers potential risks related to the effectiveness of the Board, including succession planning for the Board and our overall governance and board structure.

• The Innovation and Technology Committee assists the Board in its oversight responsibilities relating to technical and market risks associated with product development and investment as well as risk mitigation policies and procedures relating to products based on new technology or significant innovations to existing technology.

**Code of Ethics**

The Board has adopted a code of ethics that applies to all directors and employees entitled the "Worldwide Standards of Business Conduct," which is designed to help directors and employees resolve ethical issues encountered in the business

environment. ***The Worldwide Standards of Business Conduct covers topics such as conflicts of interest, compliance with laws (including anti-corruption laws), fair dealing, protecting our property and confidentiality of our information and encourages the reporting of any behavior not in accordance with the Worldwide Standards of Business Conduct.***

The Board has also adopted a "Code of Ethics" for our executive officers and all other senior finance executives.  The Code of Ethics covers topics such as financial reporting, conflicts of interest and compliance with laws, rules, regulations and our policies.

90.     The 2017 Proxy also described AMD's risk management in the context of its compensation practices:

### COMPENSATION POLICIES AND PRACTICES

In February 2017, the Compensation Committee reviewed our compensation policies and practices for employees generally and concluded that these policies and practices do not create risks that are reasonably likely to have a material adverse effect on us.

In reaching this conclusion, the Compensation Committee, with the assistance of management, assessed our executive and broad-based compensation and benefits programs to determine if any of them created undesired or excessive risks of a material nature. The assessment included (i) a review of our compensation policies and practices for employees generally, (ii) identification of the risks that could result from such policies and practices, (iii) identification of the risk mitigators and controls, and (iv) analysis of the potential risks against the risk mitigators and controls and our business strategy and objectives. Although the Compensation Committee reviewed all of our compensation programs, the Compensation Committee focused on the programs that have variability of payout and in which employees could directly affect the payout of incentives. These programs included the EIP, Annual Incentive Plan, Long-Term Incentive Plan ("LTI"), Sales Incentive Plan and 2004 Plan.

In performing the assessment and reaching its conclusion, the Compensation Committee noted the following factors that the Compensation Committee believes may reduce the likelihood of undesired or excessive risk-taking:

- Our overall compensation levels are competitive with the market;

- Our compensation practices and policies appropriately balance base pay versus variable pay and short-term versus long-term incentives;

- Although the EIP, Annual Incentive Plan, LTI and Sales Incentive Plan have variability of payout, the Compensation Committee believes that any potential risks associated with such plans are controlled or mitigated by one or more of the following: (i) the performance goals being multi-

dimensional (i.e., adjusted non-GAAP net income, adjusted non-GAAP free cash flow, revenue), thereby increasing the range of performance over which incentives are paid, (ii) the performance goals being aligned with our transformation plan and business objectives and being quantitative financial measures, (iii) the use of sliding payout scales, with the payouts in certain instances being linearly interpolated for performance falling between the performance levels set by the Compensation Committee, (iv) the ability of the Compensation Committee and/or management to exercise discretion to reduce payouts, (v) the existence of multiple internal controls and approval processes that are intended to prevent manipulation of outcomes by any employee, including the Named Executive Officers, (vi) the incentive opportunities being capped, and (vii) the adoption of CAGR PRSUs which directly align payouts with stockholder value creation;

• Although the grant of equity awards under the 2004 Plan could motivate our employees to, among other things, focus on increasing our short-term stock price rather than the creation of long-term stockholder value, the Compensation Committee believes that potential risks are controlled or mitigated by one or more of the following: (i) awarding a combination of PRSUs, RSUs and stock options, (ii) a PRSU minimum vesting period of one year from the grant date and a PRSU performance period of three-years, (iii) the vesting provisions of stock options and RSUs occurring over multi-year periods, (iv) caps on performance-based compensation opportunities, and (v) our stock ownership guidelines for our executive officers.   In addition, we prohibit our employees, including Named Executive Officers, from engaging in hedging transactions in our securities.

91. Those statements conveyed that the Board: (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) had policies to deter "excessive or inappropriate" risk taking; and (iii) maintained risk management practices consistent with AMD's Code.

92. The 2017 Proxy omitted any disclosures regarding: (i) AMD's ineffective internal controls and disclosure controls; (ii) reporting failures that failed to appropriately address the severe security flaws in AMD's chips; and (iii) Board-approved compensation programs that rewarded excessive risk taking.   The 2017 Proxy also omitted any acknowledgement of its awareness of existing material risks that could affect the Company.

93. The 2017 Proxy harmed AMD by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors.   As a result of the false and misleading statements in the 2017 Proxy, AMD stockholders voted to reelect defendants

Caldwell, Denzel, Donofrio, Householder, Inglis, Marren, Su, and Yahia to the Board.

**THE TRUTH BEGINS TO EMERGE AFTER INTITIAL DENIALS
OF THE SEVERITY OF THE SECURITY FLAW**

94.     By January 2, 2018, initial reports of the security threat posed by Spectre began to appear in online media as software developers researching software updates intended to ameliorate the problem in Linux, Microsoft, and macOS operating systems began to discuss openly the issues they believed these updates were intended to solve.  These researchers were able to determine that the fixes were related to the speculative execution function performed by the processor.  These same researchers were also quick to note that attempting to fix this hardware flaw at the software level came with a potentially substantial cost to consumers: a performance degradation of up to 30%.

95.     On January 3, 2018, following rampant speculation in the media concerning the critical security flaw, Intel released a statement publicly admitting that its chips were susceptible to the Spectre attacks.  In its statement, Intel denied that the problems were unique to its products and confirmed that the company had been working with AMD and others in an attempt to resolve the issue.  In response to the statement, Intel shed nearly $7.4 billion in market capitalization.

96.     In response to Intel's admission, AMD's initial statement that same day acknowledged that the Company had been aware of the security issue and that the risk to AMD chips was "near zero."  Following this statement, AMD's stock price actually rose, as investors believed based on these statements the Company's chips were more secure than those of its chief rival, Intel.

97.     Later that day, AMD acknowledged its processors' vulnerability to one of the Spectre Variants (GPZ Variant 1), but stated that vulnerability to another (GPZ Variant 2) had not been demonstrated on AMD processors, claiming again that it posed a "near zero risk of exploitation" due to differences in AMD architecture.  According to the statement:

> There has been recent press coverage regarding a potential security issue related to modern microprocessors and speculative execution.  Information security is a priority at AMD, and our security architects follow the technology ecosystem closely for new threats.

It is important to understand how the speculative execution vulnerability described in the research relates to AMD products, but please keep in mind the following:

- The research described was performed in a controlled, dedicated lab environment by a highly knowledgeable team with detailed, non-public information about the processors targeted.

- The described threat has not been seen in the public domain.

When AMD learned that researchers had discovered a new CPU attack targeting the speculative execution functionality used by multiple chip companies' products, we immediately engaged across the ecosystem to address the teams' findings.

98.     The statement continued by asserting that Spectre Variant 1 (Bounds Check Bypass) was "[R]esolved by software/OS updates to be made available by system vendors and manufacturers" with "[N]egligible performance impact expected."  With respect to Spectre Variant 2 (Branch Target Injection), AMD claimed that vulnerability "has not been demonstrated on AMD processors to date" and that "[D]ifferences in AMD architecture mean there is a near zero risk of exploitation of this variant."

99.     The complete truth about AMD's actual vulnerability to the Spectre attacks began to emerge on January 11, 2018, when AMD issued a statement on its website admitting that both variants of Spectre applied to AMD processors, including its recently released Ryzen CPUs. According to the statement:

- GPZ Variant 1 (Bounds Check Bypass or Spectre) is applicable to AMD processors.

  - We believe this threat can be contained with an operating system (OS) patch and we have been working with OS providers to address this issue.

  - Microsoft is distributing patches for the majority of AMD systems now. We are working closely with them to correct an issue that paused the distribution of patches for some older AMD processors (AMD Opteron, Athlon and AMD Turion X2 Ultra families) earlier this week. We expect this issue to be corrected shortly and Microsoft should resume updates for these older processors by next week. For the latest details, please see Microsoft's website.

  - Linux vendors are also rolling out patches across AMD products now.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- GPZ Variant 2 (Branch Target Injection or Spectre) is applicable to AMD processors.

    - While we believe that AMD's processor architectures make it difficult to exploit Variant 2, we continue to work closely with the industry on this threat. We have defined additional steps through a combination of processor microcode updates and OS patches that we will make available to AMD customers and partners to further mitigate the threat.

    - AMD will make optional microcode updates available to our customers and partners for Ryzen and EPYC processors starting this week. We expect to make updates available for our previous generation products over the coming weeks. These software updates will be provided by system providers and OS vendors; please check with your supplier for the latest information on the available option for your configuration and requirements.

    - Linux vendors have begun to roll out OS patches for AMD systems, and we are working closely with Microsoft on the timing for distributing their patches. We are also engaging closely with the Linux community on development of "return trampoline" (Retpoline) software mitigations.

100.   Following the disclosures made on January 11, 2018, AMD's share price fell $0.12, to close at $12.02 per share that day, a market cap loss of over $115 million.

101.   Then, on January 16, 2018, an AMD investor filed a securities class action lawsuit alleging that the Company misled the public regarding the known security vulnerability causing the price of its stock to be artificially inflated.

102.   Importantly, public disclosure of the security vulnerability had the potential to upend AMD's efforts during the relevant period to transform the Company.  By January 3, 2018, AMD had known for six months that its chips were vulnerable to at least two of the attacks discovered by the GPZ team.  During that time, AMD knowingly withheld information from its customers and stockholders, while it publicly and steadily touted the Company's financial performance as well the integrity of its chips, included its recently launched Zen-based products. The Company was also aware of the impact full disclosure of the security flaw had on Intel's stock price throughout that day and the potentially devastating effect admitting its own vulnerabilities could have on its own stock price.  The significance of the two January 3, 2018 statements to AMD's operations and future business prospects required that they be approved by the AMD Board.  Nevertheless, both statements were misleading.

103.     Finally, in March 2018, AMD would be hit with new and damaging allegations challenging the integrity and security of its prized Ryzen and EPYC lines.  On March 13, 2018, Israel-based cybersecurity researchers, CTS Labs published a research paper identifying thirteen additional security vulnerabilities impacting AMD processors.  According to the report, these vulnerabilities reside in the secure part of the AMD's Zen architecture processors and chipsets could make sensitive user data vulnerable to malicious attacks, the installation of malware inside the chip, and allow hackers to gain full access to the system.  Notably, the report identified AMD's outsource partner, ASMedia, is a subsidiary of ASUSTeK Computer, was recently penalized by the Federal Trade Commission for neglecting security vulnerabilities and subject to twenty years of mandatory external security audits and concluded that "the basic nature of some of these vulnerabilities amounts to complete disregard of fundamental security principles.  This raises concerning questions regarding security practices, auditing, and quality controls at AMD."

104.     On March 20, 2018, nearly one week following the disclosure of the CTS Labs report, AMD posted a statement acknowledging the vulnerabilities and the Company's intent to issue firmware patches "in the coming weeks."

## **REASONS THE STATEMENTS WERE IMPROPER**

105.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     that the continued use of AMD chips in devices posed serious risks to the security of data held on those devices; and

(b)     as a result of the foregoing, the officers' and directors' representations concerning the security of AMD chips and its prospects were improper.

## **DEFENDANT SU TAKES ADVANTAGE OF THE COMPANY'S FAILURE TO IMEDIATELY DISCLOSE THE SECURITY FLAW**

106.     Rather than providing the market with correct information, the Insider Selling Defendant used her knowledge of AMD's material, nonpublic information to sell her personal holdings while the Company's stock was artificially inflated.  As an officer and director of AMD,

1   defendant Su was privy to material, nonpublic information about the Company's true business

2   health.

3       107.   The threat to sensitive data in devices running AMD chips had the potential to

4   derail the Company's attempted transformation to a maker of high-end chips.  During the period

5   when AMD withheld information about the security threat, an additional problem for the

6   Company began to emerge in the form of insider trading.  According to SEC filings, defendant

7   Su sold AMD shares during the relevant period worth a total $23,036,039.44.  This sale occurred

8   during the period AMD executives and its Board were aware of security vulnerabilities in its

9   chips, but before that information was made public.  As CEO and member of the AMD Board,

10  defendant Su would have been aware of the security vulnerabilities. Defendant Su's sales were

11  timed to maximize profit from AMD's then artificially inflated stock price.

12      108.   Defendant Su's sales of over 1.8 million shares represented over 48% of her

13  personally held stock.  During the length of time immediately before the relevant period here,

14  April 2, 2016 to February 20, 2017, defendant Su sold approximately 753,000 shares,

15  representing less than 25% of her holdings.

16      109.   In sum, defendant Su sold over $23 million worth of stock that was sold at

17  artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Transaction Code | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| **SU** <br> **Current Chief** <br> **Executive Officer &** <br> **President &** <br> **Director** | 3/14/2017 | S | 25,000 | $13.92 | $348,000.00 |
| | 3/14/2017 | S | 100,000 | $13.93 | $1,393,000.00 |
| | 5/9/2017 | S | 87,500 | $10.24 | $896,000.00 |
| | 6/13/2017 | S | 37,500 | $12.34 | $462,750.00 |
| | 6/13/2017 | S | 62,500 | $12.33 | $770,625.00 |
| | 6/13/2017 | S | 62,500 | $12.00 | $750,000.00 |
| | 8/3/2017 | S | 366,405 | $13.18 | $4,829,217.90 |
| | 8/10/2017 | S | 84,813 | $12.46 | $1,056,769.98 |
| | 8/21/2017 | S | 62,500 | $12.34 | $771,250.00 |
| | 8/21/2017 | S | 62,500 | $12.02 | $751,250.00 |
| | 9/12/2017 | S | 125,000 | $12.34 | $1,542,500.00 |
| | 9/12/2017 | S | 200,000 | $12.53 | $2,506,000.00 |
| | 10/9/2017 | S | 23,638 | $13.63 | $322,185.94 |

| | | | | | |
|---|---|---|---|---|---|
| | 10/9/2017 | S | 59,071 | $13.62 | $804,547.02 |
| | 11/7/2017 | S | 125,000 | $12.09 | $1,511,250.00 |
| | 11/7/2017 | S | 178,000 | $12.00 | $2,136,000.00 |
| | 12/6/2017 | G | 9,600 | $0.00 | $0.00 |
| | 12/12/2017 | S | 87,500 | $10.08 | $882,000.00 |
| | 12/12/2017 | S | 37,500 | $9.95 | $373,125.00 |
| | 12/27/2017 | S | 87,530 | $10.62 | $929,568.60 |
| | **Total (Sales)** | | **1,874,457** | **Total (Sales)** | **$23,036,039.44** |

## DAMAGES TO AMD

110.    As a result of the Individual Defendants' improprieties, AMD marketed and sold defective products that exposed its customers to significant security flaws.  AMD fiduciaries disseminated improper, public statements concerning its products safety and performance devastating AMD's credibility.

111.    AMD's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, AMD's current and potential customers consider a company's ability to accurately describe its products safety and performance.  Businesses are less likely to award contracts to companies that are uncertain about the safety and performance of their own products.  AMD's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

112.    Further, as a direct and proximate result of the Individual Defendants' actions, AMD has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the consumer class action lawsuits over the issue and the class action lawsuit for violations of federal securities laws; and

(b)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to AMD.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

113.   Plaintiff brings this action derivatively in the right and for the benefit of AMD to redress injuries suffered, and to be suffered, by AMD as a direct result of violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   AMD is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

114.   Plaintiff will adequately and fairly represent the interests of AMD in enforcing and prosecuting its rights.

115.   Plaintiff is a current AMD stockholder and has continuously been a stockholder of AMD since December 2016.

116.   The current Board of AMD consists of the following nine individuals: defendants Caldwell, Denzel, Durcan, Marren, Householder, Inglis, Su, Talwalker, and Yahia.   Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Current Board Faces a Substantial Likelihood of Liability for Their Misconduct**

117.   As alleged above, defendants Caldwell, Householder, Inglis, and Marren breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding AMD chips which presented undisclosed security risks.

118.   Defendants Caldwell, Householder, Inglis, and Marren, as members of the Audit and Finance Committee, reviewed and approved the improper statements and earnings guidance. The Audit and Finance Committee's Charter provides that it is responsible for overseeing compliance with accounting, legal, and regulatory requirements.   Thus, the Audit and Finance Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit and Finance Committee Defendants reviewed and approved the improper press releases made to the public.   Despite their knowledge or reckless disregard, the Audit and

Finance Committee Defendants caused these improper statements.  Accordingly, the Audit and Finance Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  These defendants were also responsible as members of the Audit and Finance Committee for ensuring that AMD's internal controls were adequate and that the Company was in compliance with all SEC rules and regulations.  The insider trading incidents alleged herein were so significant that they could not have been the result of an isolated failure of oversight.  In light of the fact that each of the stock sales were reported to the SEC using Form 4, the Board was put on notice of the timing and the size of the stock transactions, all of which occurred during the period of time AMD executives were in possession of material, nonpublic information regarding the security flaw.  As such, the wrongdoing in question is strongly suggestive of a corporate culture that regularly and consciously ignores systematic red flags.  Notwithstanding this knowledge, the Audit and Finance Committee Defendants have failed to take steps to assure and that the stock trades made by defendant Su were legal.  Furthermore, the Audit and Finance Committee Defendants' conscious failure to act in the face of such warnings is a breach of their duty of loyalty, which subjects them to a substantial likelihood of liability.  Therefore, demand is excused.  Thus, defendants Caldwell, Householder, Inglis, and Marren face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

119.    Defendants Durcan, Inglis, and Yahia, as members of the Innovation and Technology Committee, reviewed technical and market risks associated with the development of AMD products.  The Innovation and Technology Committee Charter provides that it is responsible for assisting the Board in its oversight responsibilities relating to matters of innovation and technology.  In particular, the Innovation and Technology Committee evaluates and makes recommendations to the Board regarding the Company's major technology plans, strategies and intellectual property, including its research and development activities, the technical and market risks associated with product development and investment, and the protection of the Company's intellectual property.  In addition, the Innovation and Technology Committee Charter requires committee members to assess the Company's risk mitigation policies

and procedures relating to products based on new technology or significant innovations to existing technology.   Thus, the Innovation and Technology Defendants were responsible for knowingly or recklessly allowing the improper statements related to the security vulnerabilities associated with AMD products.   Accordingly, the Innovation and Technology Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.   Thus, defendants Durcan, Inglis, and Yahia face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

120.   The principal professional occupation of defendant Su is her employment with AMD, pursuant to which she has received and continues to receive substantial monetary compensation and other benefits as alleged above.   Accordingly, defendant Su lacks independence from defendants Caldwell, Denzel, Durcan, Marren, Householder, Inglis, Talwalker, and Yahia due to her interest in maintaining her executive position at AMD.   This lack of independence renders defendant Su incapable of impartially considering a demand to commence and vigorously prosecute this action.   AMD paid defendant Su the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2017 | $924,997 | $6,980,740 | $1,897,770 | $1,076,700 | $14,614 | $10,894,821 |

Further, defendant Su engaged in insider selling during the relevant period, wherein she realized a profit when she sold AMD shares worth more than $23 million, based on material, nonpublic information concerning the flaws in the basic architecture of Intel chips that would allow malicious programs to steal sensitive user data, such as passwords, proprietary information, or encrypted communications.   Accordingly, defendant Su is incapable of impartially considering a demand to commence and vigorously prosecute this action because she has an interest in maintaining her principal occupation and the substantial compensation she receives in connection with that occupation.   Demand is futile as to defendant Su.

121.   Plaintiff has not made any demand on the other stockholders of AMD to institute this action since such a demand would be a futile and useless act for the following reasons:

(a)    AMD is a publicly held company with over 969 million shares outstanding as of April 27, 2018, and thousands of stockholders;

(b)    making a demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Director Defendants for Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9

122.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by the Director Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

123.   SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated under section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

124.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2017 Proxy Statement.  The 2017 Proxy Statement contained a proposal to AMD stockholders urging them to re-elect the members of Board.  The Proxy Statement, however, misstated or failed to disclose deficiencies in AMD's internal and disclosure controls that were

known to the Board when the Proxy Statement was filed reporting failures known to the Board when the Proxy Statement was filed, which failed to address the sever security flaws in the architecture of AMD chips.  By reasons of the conduct alleged in this Complaint, the Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9.  As a direct and proximate result of the Director Defendants' wrongful conduct, AMD misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding AMD's recommendation to re-elect the current Board.

125.    The misleading information contained in the 2017 Proxy Statement was material to AMD stockholders in determining whether or not to elect the Director Defendants.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the Proxy Statements was an essential link in the reelection of nominees to the Board.  Plaintiff, on behalf of AMD, thereby seeks relief for damages inflicted upon the Company based on the misleading 2017 Proxy Statement in connection with the improper re-election of the members of the Board.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    The Individual Defendants owed and owe AMD fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe AMD the highest obligation of good faith, fair dealing, loyalty, and due care.

128.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within AMD, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

129.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer

Defendants either knew, were reckless, or were grossly negligent in not knowing AMD's chips and processor products contained significant security flaws. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

130. The Director Defendants owed AMD the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning false and or misleading statements regarding the safety of AMD chips and processors. The Director Defendants knew or were reckless in not knowing that: (i) AMD's chips and processor products were vulnerable to security flaws; and (ii) failed to maintain adequate disclosure procedures with respect to AMD's operations and risk management. Moreover, defendant Yahia lacks independence according to the Nasdaq Stock Market ("Nasdaq") and SEC rules as identified in AMD's 2017 Proxy. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

131. The Audit and Finance Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit and Finance Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit and Finance Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit and Finance Committee Charter in effect at the time.

132. The Innovation and Technology Committee Defendants breached their fiduciary duty of loyalty by recklessly failing to mitigate the risks associated with AMD's chips and processor products that were vulnerable to security flaws.

133. Defendant Su lacks independence according to Nasdaq and SEC rules as identified in AMD's 2017 Proxy. Further, defendant Su breached her duty of loyalty by selling AMD stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was proprietary, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which defendant Su used for her own benefit when she sold AMD common stock.

134.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AMD has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

135.     Plaintiff, on behalf of AMD, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

136.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.     As a result of the misconduct described above, the Individual Defendants have caused AMD to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

138.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

139.     Plaintiff, on behalf of AMD, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

140.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of AMD.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to AMD.

142.     Defendants Su sold AMD stock while in possession of material, nonpublic information that artificially inflated the price of AMD stock.  As a result, defendant Su profited from her misconduct and was unjustly enriched through her exploitation of material and nonpublic inside information.

143.     Plaintiff, as a stockholder and representative of AMD, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits,

and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

144.    Plaintiff, on behalf of AMD, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of AMD, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing AMD to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AMD and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.    a proposal to strengthen the Company's development and design of chips for increased security;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.    a provision to permit the stockholders of AMD to nominate at least three candidates for election to the Board;

4.    a proposal to strengthen the Company's controls over financial reporting;

5.    a proposal to strengthen AMD's oversight of its disclosure procedures; and

6.    a provision to control insider selling;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a

1  constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or

2  their other assets so as to assure that plaintiff on behalf of AMD has an effective remedy;

3       D.     Awarding to AMD restitution from defendants, and each of them, and ordering

4  disgorgement of all profits, benefits, and other compensation obtained by the defendants,

5  including all ill-gotten gains from insider selling by defendant Su;

6       E.     Awarding to plaintiff the costs and disbursements of the action, including

7  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

8       F.     Granting such other and further relief as the Court deems just and proper.

9  **JURY DEMAND**

10       Plaintiff demands a trial by jury.

11  Dated: June 14,  2018          ROBBINS ARROYO LLP

12                             BRIAN J. ROBBINS
   FELIPE J. ARROYO
13                             STEVEN R. WEDEKING

14                            /s/*Brian J. Robbins*

15                             BRIAN J. ROBBINS

16                             600 B Street, Suite 1900
   San Diego, CA 92101
17                             Telephone: (619) 525-3990
   Facsimile: (619) 525-3991
18                             E-mail: brobbins@robbinsarroyo.com
            farroyo@robbinsarroyo.com
19                                     swedeking@robbinsarroyo.com

20                           Attorneys for Plaintiff

21

22

23

24

25

26  1271454

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Jacqueline Dolby, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 6/12/18

JACQUELINE DOLBY